van Gestel, Allan, J.
This matter is before the Court on the Plaintiffs renewed Motion for Temporary Restraining Order, Short Order of Notice, and Preliminary Injunction, Paper #3.
The motion was originally filed on June 21, 2007, and scheduled for hearing on June 25, 2007. On, or shortly before, June 25, 2007, the parties entered into an agreement, memorialized in a letter dated June 25, 2007, to the effect that all matters regarding this case would be held in abeyance until July 25, 2007, with all parties reserving all of their rights, “in order to permit further discussions among the Members of the Core Development Group companies concerning [their] pending development project.” Those discussions, apparently, did not resolve the parties’ impasse and thus the motion for injunctive relief has been renewed.
BACKGROUND[1]
The underlying complaint seeks a declaratoiy judgment and related injunctive relief involving the obligations of the plaintiff, MAXX Private Investments LLC (“MAXX”), with regard to a June 19, 2007, Funding Notice or capital call (“Capital Call #6”) in connection with a joint venture for a major development project known as “Waterside Place/Waterside Crossing” in the Seaport district in South Boston. MAXX is a Delaware limited liability company based in Braintree, Massachusetts. It is owned by J. Leo Barry, Edward A. Fish, Antonio Frias and the Kraft Group, LLC.
The defendant Core Development Group, LLC (“Core I”) is a Massachusetts limited liability company based in Boston. The defendant Core Development Group II, LLC (“Core II”) is also a Massachusetts limited liability company based in Boston. (Core I and Core II are collectively referred to herein as “the Company.”)
The defendant Drew/Core Development, LLC (“Drew”) is a Delaware limited liability company also based in Boston.
The defendant Vornado CDG I, LLC (“Vomado I”) is also a Delaware limited liability company. It is based in Wilmington, Delaware. The defendant Vomado CDG II, LLC (“Vornado II”) is also a Delaware limited liability company based in Wilmington, Delaware. Both Vomado I and Vornado II are wholly owned by Vomado Really, L.P.
Drew is a Member and a Manager of Core I and Core II. Vornado I is a Member and Manager of Core I and Vomado II is a Member and Manager of Core II. MAXX is a Member, but not a Manager, of Core I and Core II.
On August 31, 2006, MAXX, Drew and Vornado I entered into an Amended and Restated Operating Agreement of the Core Development Group, LLC (the “Core I Agreement”). Pursuant to this Agreement, Core I was formed for the purpose of developing, leasing and operating the parcel of land in the Seaport district generally known as the “Core Block.” The Core Block consists of approximately 11.4 acres within a block framed by Congress Street, D Street, Summer Street, Pump House Road and the Massport Haul Road. It is this Core Block development that is also referred to as Waterside Place/Waterside Crossing.
On the next day, September 1, 2006, MAXX, Drew and Vornado II entered into an Operating Agreement of the Core Development Group II, LLC (the “Core II Agreement”). Pursuant to this Agreement, Core II was formed for the purpose of developing, leasing' and operating residential condominiums and a hotel in the same Core Block development.
For purposes of this memorandum the Core I Agreement and the Core II Agreement are essentially identical. The primary difference between the two agreements is that the Core I Agreement addresses the commercial and retail components of the development and the Core II Agreement addresses the residential components. Thus, hereafter the Court will refer to the two agreements collectively as the “Agreement.”
The joint venture is made up of Vomado I and II, MAXX and Drew. At all material times for purposes of this memorandum Vornado I and II, and MAXX, each held a 48.75 funding percentage interest in the joint venture and Drew held a 2.50 percentage.
MAXX resists the June 19, 2007, Capital Call #6 and seeks a declaration from this Court that Capital Call #6 was not authorized under the terms of the parties’ Agreement. MAXX also seeks injunctive relief against the defendants taking action pursuant to the Agreement to dilute MAXX’s interest in the joint venture and to prevent MAXX from voting with regard to major aspects of the development.
Section 3.3(a) of the Agreement provides: “The Members agree that Additional Capital Contributions . . . may be called for . . . in accordance with the applicable Development Budget.” Development Budgets) are defined to mean, “as applicable, the Core Block Retail and Retail Parking Budget, the D-3 Retail & Retail Parking Budget, the Core Block Hotel Budget, *31 the Pre-Development Budget and any other Approved Budget in place from time to time.”
The “Applicable Development Budget” specifies that the budget for the Core Block component of the Project, as appearing on Exhibit 4.2 to the Agreement and still as of June 18, 2007, is $601,716,082. Of that amount, $414,109,691 was stated to be for “hard costs.”
As of April 12, 2007, the Managers disclosed to MAXX that the hard costs associated with the Core Block were by then $161,164,739 higher than the costs approved in the Agreement. Thereafter, the Managers worked with the architects to develop additional details that were not included in certain schematic drawings on which the April numbers were based, and to make modifications in some of the details that had been included for the purpose of making the Project more cost effective.
In addition to working on potential cost savings on what was called Scheme A, the Managers also worked on two variants called Scheme B.1.2 and Scheme B.1.3. At a meeting on May 10, 2007, the Managers discussed all three alternatives with MAXX.
On June 15, 2007, the Managers presented to MAXX, by memorandum, a more formal version of the three alternative plans. MAXX claims that none of the three were consistent with the terms of the Development Budget and none of them had, or has since, been approved by MAXX. MAXX insists that the Agreement requires such approval.
The June 19, 2007, Capital Call #6 is in the total amount of $1,483,531.09. The 48.75% share called for from MAXX is $723,221.41.
Section 3.3(a) of the Agreement specifies that Additional Capital Contributions are to be made “within five (5) Business Days” of a Capital Call. A “Business Day” is defined as “any day except Saturday or Sunday on which banks are open for the conduct of business in Boston, Massachusetts.” Thus, MAXXs payment, if the June 19, 2007 Capital Call #6 was valid and but for the abeyance agreement described above, would have been due before the end of banking business on June 26, 2007.
In an earlier June 12, 2007, letter, attached to the Verified Complaint as Exhibit 9, the Managers warned MAXX as follows:
If you fail to fund within five (5) business days of any . . . [Capital Call] requests, your failure will constitute an Event of Default under Section 4.9(d) of the Operating Agreements, which will entitle the Managers to exercise our rights under Section 3.4 of the Operating Agreements to make a Contribution Loan or a Make-up Contribution. In such an event, the Company will be entitled under Section 4.10 of the Operating Agreements to cause you to be a passive Member without voting or approval rights.
The Core Agreements in Sections 4.1(a), provide that the management of the Company’s business operations and affairs is vested in the Managers. However, the Company may not undertake a “Major Action” unless it has been proposed by the Managers and approved by MAXX. The definition of a “Major Action” includes any “material amendment of or material deviation from the Development Plan.”
The requirement that all the Members, including MAXX, must concur in any Major Action creates a risk of a deadlock. Consequently, the Core Agreements establish a procedure for resolving such deadlocks. Under that procedure, if MAXX refuses to approve a Major Action, the parties are to meet and work together in good faith to attempt to resolve the disagreement. If the parties are unable to resolve the disagreement within 14 days, MAXX and Vornado each have the right to initiate a Buy-Sell procedure. Either MAXX or Vornado may offer to purchase the Membership Interest of the other. The offeror must include a proposed purchase price. Within 30 days after receipt of the offer, the offeree may elect to accept the offer or require the offeror to sell its interest in the Company to the offeree at the proposed purchase price.
The definition of a Major Action also includes expenditures that are materially in excess of all “applicable Approved Budget.” This is covered in clause (g) of the definition, which reads:
Causing the Company to incur any expense that, individually or when combined with other expenses falling within the same category, exceeds (i) 105% of the amount therefor in the corresponding line item of the applicable Approved Budget then in effect, calculated in each case after giving effect to: (A) any amounts allotted to such category from the contingency line item in the applicable Approved Budget, and (B) any amount allotted to such category from savings achieved in any other category, or (ii) 102% of the entire applicable Approved Budget, unless it is an Emergency Expense.
“Approved Budget” is defined to mean, “as applicable, any Development Budget and/or Operating Budget, and any budget for any other component of the Project subsequently proposed by the Managers and approved by MAXX pursuant to see. 4.1(d) or sec. 4.8 hereof, and, in each case, any deviation therefrom that is permitted pursuant to the terms of this Agreement.”
The term “Development Budget(s)” is defined in the Core Agreements to mean “as applicable, the Core Block Retail & Parking Budget, D-3 Retail & Retail Parking Budget, the Core Block Hotel Budget, the Pre-Development Budget and any other Approved Budget in place from time to time.” The Core II definition includes “as applicable, the Core Block Residential & Residential Parking Budget, the Pre-Development Budget and any other Approved Budget in place from time to time.”
*32 Capital Contributions that are not made in response to Capital Calls are prohibited unless approved as a Major Action. As mentioned above, any borrowing by the Company must also be approved as a Major Action. As a result, Capital Contributions in response to Capital Calls are the only source of funding available to the Company to pay expenses, in the absence of an approved Major Action.
Section 3.4 of the Core Agreements provides that if a Member fails to make a Capital Contribution in response to a Capital Call, the other Members may make a Make-up Contribution equal to the amount that the defaulting Member has failed to pay. The defaulting Member’s net Capital Contribution to the Company is thereupon reduced by two times the amount of the Make-up Contribution, and the net Capital Contribution of the Members that make the Make-up Contribution is increased by the same amount.
It was in this context that the Court heard oral argument and has since examined the key documents involved.

DISCUSSION

In order to prevail on its request for preliminary injunctive relief MAXX bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to the defendants from being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
Before stating its analysis and conclusions, this Court pauses to observe that the parties in this case are extremely sophisticated, and each also certainly had, and has, constant advice and assistance from highly competent counsel. These sophisticated parties negotiated and chose specific language to state their intentions in the Agreement and in the documents, including the Capital Calls, utilized in the Agreement’s implementation. Here, there was no disparity in bargaining power or lack of sophistication about the matters at hand. Where knowledgeable and fully represented parties choose to embody their relationship in carefully crafted documents they are entitled to and should be held to the language they chose. Cabot Corporation v. AVX Corporation, 448 Mass. 629, 638 (2007). In short, the Court must consider the Agreement[2] and other documents on their face and apply the language used as stated.
On the record before it, this Court concludes that Capital Call #6 is not authorized under the parties’ Agreement. Additional Capital Contributions of the kind in issue may be called for only in accordance with the applicable “Development Budget.” The “Applicable Development Budget” currently in place specifies that the budget for the Core Block component of the project is $601,716,082. As of April 12, 2007, however, the Managers disclosed that the hard costs associated with the Core Block were by then $161,164,739 higher than the costs approved in the Agreement. MAXX contends, and the Managers deny, that on May 10, 2007, the Managers stated that the previously approved Development Plan was no longer feasible in light of the increased costs and that it would not be pursued any further.
Also, although one was initiated but promptly retracted, there has been no Major Action presented to MAXX dealing with any aspect of the situation involving Capital Call #6.
Further, none of the three alternatives presented to MAXX by the Managers on June 15, 2007, have been approved by MAXX, as required by the Agreement.
Consequently, MAXX has met its burden of showing the requisite likelihood of success on the merits of the limited declaratory judgment sought here.
The harm MAXX could sustain if the requested preliminary injunction is not granted is that already threatened by the Managers on June 12, 2007: the unilateral dilution of its equity in the Company; the elimination of its right to consent to future Major Actions; the stripping of its voting and approval rights under the Agreement; and action by the defendants to proceed with a project for which there is no consent from a holder of a 48.75% funding interest. These are among the kinds of “rights that cannot be vindicated should [MAXX] prevail after a full hearing on the merits.” GTE Products Corp., 414 Mass. at 725 (quoting Packaging Indus. Group, 380 Mass. at 616). This constitutes irreparable harm.
Finally, the balance of harms between MAXX and the defendants falls decidedly on MAXXs side. MAXX is left without any reasonable or effective remedy or alternative. The Managers, on the other hand, can, if they choose, pursue the Major Action route provided for in the Agreement.

ORDER FOR PRELIMINARY INJUNCTION

For the foregoing reasons, the Plaintiffs Motion for Temporary Restraining Order, Short Order of Notice, and Preliminary Injunction, Paper #3, is ALLOWED. Upon payment of the requisite fee and the provision of the required security by MAXX Private Investments, LLC, the defendants Drew/Core Development, LLC, Vomado CDG I, LLC, Vomado CDG II, LLC, Core Development Group, LLC and Core Development Group II, LLC, their officers, agents, attorneys, employees and anyone in active concert or participation with them, are restrained and enjoined from diluting MAXXs interests, divesting MAXXs right to vote, or taking any other actions with respect to MAXXs interests in the joint venture that would arise under the Agreement among the parties resulting from MAXXs failure or refusal to fund the “Additional Capital Call #6,” dated June 19, 2007, attached as Exhibit 12 to *33 the Verified Complaint herein or any substantively identical Capital Call #6 hereafter issued.
Pursuant to Mass.R.Civ.P. Rule 65(c), the Court deems proper and directs the giving of security by MAXX in the sum of $723,221.41, for the payment of such costs and damages as may be incurred or suffered by the defendants if they are found to have been wrongfully enjoined or restrained. The provisions of Rule 65.1 shall apply to a surety upon a bond or undertaking under this preliminary injunction.
This preliminary injunction shall remain in force until modified or dissolved by this Court or any appropriate appellate court.
This memorandum and order is not to be considered or taken as establishing in anyway the law of this case.

The facts set forth in this Background section are found in much greater detail in the Verified Complaint, Paper #1, filed on June 21, 2007, the Affidavit of Susan Allen, Paper #12, filed on August 1, 2007, and the Affidavit of Edward A. Fish, Paper #15, filed on August 10, 2007.

The Court observes that the Agreement covers 66 pages of single-spaced text, which includes 145 separate defined words or phrases, and has several schedules, exhibits and plans attached thereto.