Gants, Ralph D., J.
On June 21, 2005, the Massachusetts Port Authority (“Massport”) entered into a Development Agreement with the defendant Core Development Group LLC (“CDG”) in which CDG obtained an option to enter into five separate 95-year ground leases for various parcels of land in the Seaport section of South Boston (known as the Core Block) in order to develop a mixed-use project to be known as Waterside Place. Waterside Place was to include a retail mall, hotel, residential condominiums, and a parking garage. The Development Agreement provided, among other terms, that;
as consideration for the option, CDG was to make option payments to Massport, beginning at $450,000 per year, which may be credited (at least in part) against future rent payments once the ground leases were executed;
the Agreement would terminate if CDG did not enter into the ground leases by the designated closing dates, with the retail mall and garage scheduled to close first;
the improvements on the Core Block would be made in accordance with a Development Concept plan, previously approved by Massport (“the Development Plan”); and
the various developments would be finally completed within set deadlines after the closing dates: 44 months for the retail mall and garage, and 30 months for the hotel and condominium towers.
When the Development Agreement was signed, CDG was managed by Drew Company, Inc. (“Drew”), whose expertise was in hotels. Drew soon commenced negotiations to broaden CDG into a joint venture with the plaintiff MAXX Private Investments LLC (“MAXX”) and the defendant Vomado CDG I LLC and Vomado CDG II LLC (collectively, “Vornado”). The negotiations culminated in the execution of two similar agreements: the Amended and Restated Operating Agreement of CDG, executed on August 31, 2006 (“the Core I Agreement”), which governed all but the hotel, and the Operating Agreement of Core Development Group II, LLC, executed on September 1, 2006, which governed the operation of the hotel to be developed (“the Core II Agreement”). Since the terms of the Core I and *457 Core II Agreements that are relevant to this case are identical, this Court, for the sake of simplicity, will refer to both Agreements as the CDG Operating Agreement and to the two CDG entities as CDG. The Operating Agreement cogently sets forth CDG’s purpose — to acquire a leasehold interest in the Core Block and develop the mixed use project to be known as Waterside Place.
Under the Operating Agreement, CDG had three members: MAXX, Vomado, and Drew.[1] Vomado and Drew were CDG’s Managers, but they could only act with each other’s consent. Operating Agreement at §4.1(b). The Managers had the authority to carry out the purposes of CDG and to take all action needed to implement the Development Plan, but they could take a Major Action, as defined in the Operating Agreement, only if it were provided for in the Development Plan or in an Approved Budget or otherwise received MAXX’s written approval. Id. at §4.1(d). If the Managers wished to take a Major Action that required MAXX’s approval, they were required to give written notice of the proposed Major Action to MAXX and MAXX had five business days to respond, with the failure to respond deemed consent to the Major Action proposed. Id. at §4.1(e). If MAXX were to disapprove of a Major Action, and if MAXX and the Managers were unable to resolve the disagreement within 14 calendar days from the date of MAXXs disapproval, then MAXX and Vomado “shall have the right to initiate a Buy-Sell in respect of their Membership Interests (but not the Membership Interest of Drew) . . .” Id. at §4.1(e)(iii). If MAXX were to buy Vomado’s interests, then MAXX would succeed Vomado as the “developer” under both the Operating Agreement and the Development Plan. Id
The procedure for the Buy-Sell was carefully laid out in the Operating Agreement. If MAXX or Vomado wished to initiate a Buy-Sell, it had to deliver to the other a written notice of the offer, stating the “total cash value of all of the assets of [CDG] before debt (the ‘Project Value’) and include a computation, in reasonable detail, of the purchase price for each Member’s interest in [CDG] that would result from that value . . .” Id at §4.1(e)(iv)(A). The Buy-Sell Notice also had to specify a closing date for the consummation of the proposed purchase, which, unless otherwise agreed, could be no sooner than 30 days after delivery of the Notice and no later than 120 days. Id Within 30 days of receipt of the Buy-Sell Notice, the member receiving the offer had to make a choice — it could elect to purchase the other’s Membership Interest at the Buy-Sell price or it could require the member making the offer to purchase its Membership Interest at the Buy-Sell price. Id. at §4.1(e)(iv)(B). If the member receiving the Buy-Sell Notice failed to communicate its choice within the 30-day deadline, it was deemed to have accepted the offer to sell and had to sell its Membership Interest at the Buy-Sell price. Id. at §4.1 (e)(iv)(C).
The crux of this case is that Vomado proposed a Major Action (the revision of the Development Plan and Approved Budget). MAXX disapproved, and Vornado initiated the Buy-Sell procedure. MAXX has refused to buy or sell within the time frame provided, and Vomado seeks an order from this Court compelling MAXX to sell its Membership Interest to resolve the deadlock. Since time is of the essence, a two-day trial was conducted by this Court on July 22 and 23, 2008. Based on the testimony at trial and the exhibits admitted into evidence, viewed in light of the governing law, this Court makes the following findings of fact and conclusions of law.
FINDINGS OF FACT
When Vomado was exploring whether to enter into the joint venture to develop Waterside Place, it prepared a pro forma that estimated the total project cost to be $690.4 million, and its return on investment (as measured by its net operating income divided by its net cost) to be 8.75 percent.[2] Shortly after it had entered the joint venture, however, it obtained information from two separate sources that made clear that the Development Plan (now known as Scheme A) was not going to be economically feasible. First, Vomado obtained an estimate from its contractor of the cost of developing the project in accordance with Scheme A. The contractor’s estimate of construction “hard costs” was roughly $ 145 million more than Vomado’s estimate in its earlier pro forma, largely because the contractor found that the earlier estimate significantly underestimated the amount of steel that would be needed for the deck above the Silver Line on which the retail mall would be built. Second, Vomado spoke to various potential retail anchor tenants, including Target, and learned that Scheme A would be unacceptable to them because they wanted access ramps that would bring parking closer to the stores.
Vomado informed MAXX at a meeting on April 12, 2007 of the substantial increase in estimated hard costs. On April 13, 2007, Susan Allen, on behalf of Drew, sent an email to one of MAXXs principals, Edward Fish, informing him that Vornado had met with MAXXs attorneys and presented them with a revised “soft cost” budget that reflected the delay in Core Block construction from December 1, 2007 to February 1, 2008. She told Fish that Vomado would be sending MAXX a revised budget with the new “soft costs” the next week as a Major Action.[3] She also said that the revised budget “would not change the hard costs at this time since that is so much in flux — that change will occur later this spring once we collectively go through more of the pricing exercises.”
On April 23, 2007, CDG and Massport executed an Amendment to the Development Agreement reflecting Massport’s consent to Vornado serving as a Manager and Member of the Developer and its acknowledgment that Vornado was a “Retail Expert” as defined in the Development Agreement. The Amendment also extended the deadlines for the closing of the ground leases for the retail mall and garage (from April 1, 2007 *458 to April 1, 2008), and the first condominium tower (from April 1, 2007 to April 1, 2009).
Vornado then designed three alternatives to Scheme A that would reduce the overall cost of the project and be more acceptable to tenants — known as Schemes B. 1.1, B.1.2, and B.1.3. At a Members meeting on May 10, 2007 the Managers informed MAXX of their decision not to pursue Scheme A in view of the increased costs. They distributed Scheme B. 1.3 at that meeting.
On June 4, 2007, Fish, on behalf of MAXX, informed the Managers in writing that MAXX believed it no longer had any obligation to make Capital Contributions under the Operating Agreement until an amended Development Plan and an amended Development Budget was approved by all the Members. Vornado responded in writing on June 12, 2007, acknowledging that a revision of the Development Plan or the Approved Budget would constitute a Major Action that would require MAXXs approval, and stating that it did not intend to take any such Major Action without approval. Rather, Vornado contended that it was simply exploring the feasibility of revising the Development Plan and the Approved Budget, which it was expressly permitted to do under clause (u) of the definition of Major Action in the Operating Agreement, which provided, “Notwithstanding anything herein to the contrary, the preliminary exploration and review of the feasibility or the potential outcomes or consequences of adopting a Major Action shall not, in and of itself, constitute a Major Action requiring MAXX consent.” Vornado informed MAXX that, if it failed to provide capital contributions in response to a Funding Notice, MAXXs failure would constitute an Event of Default under the Operating Agreement.
On June 19, 2007, the funding dispute became ripe when the Managers issued their sixth Capital Call. MAXX had provided its required capital contributions in response to the five earlier Capital Calls, but it refused to provide a capital contribution in response to the sixth. Instead, on June 21, 2007, MAXX filed ■the instant action, seeking a declaration that:
1. The Managers were in material breach of the Agreement for having incurred expenses beyond those authorized in the Approved Budget and for having issued the June 19 Capital Call; and that
2. MAXX was not obligated to make any additional capital contributions to CDG in response to a Capital Call unless it agreed to the Major Actions of revising the Development Plan and the Approved Budget.
MAXX also sought a preliminary injunction barring the Managers from invoking the sanctions allowed under the Operating Agreement when a Member fails to fund a Capital Call. Specifically, those sanctions include:
Under Section 3.4(a)(ii), if Vornado were to have paid the capital contribution that MAXX owed, MAXXs capital contributions would be reduced (and Vomado’s increased) by twice the amount of the Make-Up Contribution, which would doubly dilute MAXXs Membership Interest and doubly increase Vomado’s;
Since the failure of a Member to make an Additional Capital Contribution in response to a Capital Call is an Event of Default under Section 4.9 of the Operating Agreement, MAXX’s failure could result in the elimination of MAXXs right to approve Major Actions or to initiate a Buy-Sell. Operating Agreement at §4.10(b) & (d).
On August 13, 2007, Judge Allan van Gestel, then presiding over this session, allowed MAXXs motion for preliminary injunction [23 Mass. L. Rptr. 29). On the record before him, Judge van Gestel concluded “that Capital Call #6 is not authorized under the parties’ Agreement.” Memorandum and Order on Motion for Preliminary Injunction, at 8. Having so preliminarily declared, however, his Order did not expressly bar the Managers from issuing future Capital Calls. Rather, it simply preliminarily enjoined the Managers from imposing against MAXX any of the sanctions otherwise available to them under the Operating Agreement when a Member refuses to honor a Capital Call. The next day, on August 14, 2007, MAXX issued a Notice of Default, claiming that the Managers were in default by their issuance of Capital Call #6.
Judge van Gestel’s preliminary injunction created a dilemma for the Managers. CDG continued to incur expenses, including the monthly option payments due to Massport, but it did not believe that, consistent with Judge van Gestel’s August 13 decision, it could issue another Capital Call to obtain the capital contributions needed to meet these expenses. If the issuance of Capital Call #6 was indeed not authorized by the Operating Agreement because the expenses that had been incurred were not in furtherance of the original Development Plan, the Notice of Default posed the risk that the Managers would be found to have committed an Event of Default, for which the remedies included their removal as Manager and the loss of their right to initiate a Buy-Sell.
The Managers initially sought to resolve this dilemma on August 31, 2007 by requesting MAXXs approval of two Major Actions — to modify the Development Plan by replacing Scheme A with Scheme B.1.2 and to modify the Development Budgets in accordance with the change in development schemes. By this time, Vornado had determined that Scheme B.1.2 was preferred by the retail tenants. Scheme B.1.2 was significantly lower in cost than Scheme A but it was also roughly 110,000 square feet smaller, since it eliminated one level of retail stores in the proposed mall. Vornado determined that the loss of gross revenue arising from the reduced square footage was more than offset by the reduction in the costs of construction, which resulted in a better net return on investment from Scheme B.1.2 than Scheme A.
On September 10, 2007, MAXX, in writing, disapproved both proposed Major Actions, claiming that it had not been provided with enough information to make an *459 informed decision. It specified the information it believed it needed. On September 20, 2007, the Managers provided the information MAXX requested, including the plans for Scheme B.1.2, an update as to permitting, their plans to apply for state funding under the Massachusetts Investment Incentive Program (Chapter 293 of the Acts of 2006, known as “I-Cubed Funding”), their development budgets, cost-estimation methodology, and pro formas, a retail leasing and Massport update, and various consultant reports. The pro forma provided to MAXX estimated that CDG’s return on net adjusted total development costs under Scheme B.1.2 would be 7.8 percent. The Managers also asked for a meeting with MAXX as soon as possible.
On September 20, 2007, the Managers moved for a preliminary injunction, asking for an order declaring that MAXX’s Notice of Default not affect the Managers’ right to manage CDG or to initiate a Buy-Sell. On September 24, 2007, the day this motion was heard, Russell DeMartino, Vomado’s Executive Vice President for Development, informed the Court by affidavit that the CDG Managers would pay all the expenses covered by Capital Call #6 and all subsequently incurred expenses, including the Massport option payments, and seek a determination at trial as to whether MAXX had an obligation to pay its share of these expenses. In his written decision, issued on September 25, 2007, Judge van Gestel denied the Managers’ motion, declining to take any action that would change the terms set forth in the “four comers of the [Operating Agreement].” Memorandum and Order on Defendants’ Motion for Temporary Restraining Order and Preliminary Injunction, at 5-8. However, Judge van Gestel observed that MAXX, in a footnote to its opposition, had written that the Managers had provided information to MAXX after moving for the preliminary injunction that MAXX had not yet had an opportunity to review. He then declared:
[T]his Court will deem the defendants to have made their current Major Action proposal on September 20, 2007, the date that the information referenced above was provided to MAXX The Court similarly will deem that MAXX must respond to the Major Action proposed as if had been presented on the date of this Memorandum and Order, September 25, 2007.
Id. at 6-7. Judge van Gestel also observed that MAXX, in another footnote to its opposition, had agreed that the time for the Managers to cure their alleged defaults could be extended to September 27, 2007. The Court extended the time period to cure any alleged default to September 28. The Court expressly declined to express any view as to what method of cure was legally permitted under the Operating Agreement, but the Court added that “it would be strongly inclined to deny any request by MAXX for injunctive relief that is designed or intended to prevent the defendants from initiating or buying in at a Buy-Sell procedure or continuing their role as Managers of the Company, if the defaults have been cured, regardless of the method of cure chosen.” Id. at 7-8.
On September 27 and 28, in an effort to cure the alleged default, Vomado paid $2,259,011.20 in outstanding invoices by transferring money into CDG’s account, which then paid the invoices with CDG checks. Vomado, however, did not account for this funding as either a loan from Vomado or as capital contributions by Vomado. Consequently, these payments were not debts owed by CDG and did not affect the Membership Interests. In his September 25 decision, Judge van Gestel opined that, if the Managers directly paid the expenses at issue, they “can probably protect their rights, if they have any, to recover from MAXX any share in those payments MAXX may owe by an amendment to their counterclaim.” Id. at 3 n.2. See also id. at 3 (observing that the “question of who is obligated to pay the expenses under the circumstances in place when they were, or are being, incurred . . . can be resolved, if necessaiy, after a trial on the merits, or perhaps on a summaiy judgment motion”). Consequently Vomado essentially decided to pay the expenses at issue itself, thereby avoiding any claim of default, with the expectation that MAXXs obligation to pay its share of expenses would be resolved later at trial.
On October 1, 2007, the Managers agreed to MAXXs request to meet on October 9 to discuss the Requests for Major Action, and agreed to extend the deadline for MAXXs reply to October 10. On October 10, 2007, Fish, on behalf of MAXX, informed the Managers in writing that, while it appreciated the Managers’ candor at the meeting as to the status of the project and the likelihood of the need for further changes, it still disapproved of both the proposed revised Development Plan and the proposed revised Development Budget. As reasons for its disapproval, Fish wrote that the proposed revised project “represents a significant deviation in scope and timing from that which MAXX approved in connection with the execution of each of the Operating Agreements.” He concluded, “Because it is significantly different, and because there remain a number of uncertainties as to the final project, MAXX disapproves the Request for Major Action.”
Beginning in late September 2007, the Managers, without telling MAXX, decided to explore whether other developers wanted to invest in the Waterside Place project. Having just completed a Project Status Report for MAXX they prepared a similar document for prospective investors on September 20, 2007. The pro forma in this Report, however, estimated CDG’s return on net adjusted total development costs as 9.3 percent, because Vomado feared that no one would be interested if the return were only 7.8 percent. To increase the return on investment. Vomado made one major change — it increased the estimated sales price of its condominium units from $887.56 per square foot to $1050 per square foot, which yielded roughly $40 million more in gross sales revenues from its residential units.
*460 Over the next several months, Vornado met with four major developers who were potential development partners. Although the focus of their discussions was the possibility of these developers purchasing MAXX’s interest in the Waterside Place project, Vornado did not close the door to the possibility that these developers could play an active management role or even displace Vornado as a Manager. None of the developers expressed any meaningful interest in investing or otherwise partnering in the project.
While Vornado was looking for other developers who would be willing to replace MAXX as a joint venturer, it was also looking for anchor tenants for the retail mall designed in Scheme B. 1.2. In the fall of 2007, it agreed upon the economic terms by which Stop & Shop would become an anchor tenant at Waterside Place, and effectively finalized those terms in the early spring of 2008, although an executed letter of intent has yet to be received.[4] Negotiations progressed more slowly with Target and even broke off in January 2008, but ultimately reached fruition on June 24, 2008, when Target Corporation provided a letter of intent setting forth the lease terms which its Regional Real Estate Manager would recommend for the Target Board’s approval. Among these terms, Target would agree to a 25-year lease of 185,288 square feet of space in the retail mall at a rent of $900,000 per year (with no percentage rent) and would contribute $38 million towards the Developer’s costs for premise construction and on-site improvements.
On March 18, 2008, the Managers’ efforts to obtain more time from Massport bore fruit — the Massport Board, in Executive Session, voted that the closing date for the Core Block was changed to July 1, 2010, “provided that the Developer certifies in writing by December 31, 2008 that- the buyout of the Maxx partner was completed.” Massport letter, March 25, 2008. Even this extended closing date could be postponed an additional year — to July 1, 2011 — if the Developer were to certify in writing that: (1) it had been unable to obtain either a hard commitment from an anchor department store or a commitment for construction financing on commercially reasonable terms, and (2) either paid $300,000 to Massport or certified that it had spent at least $1.5 million for schematic designs or other professional services related to the design of the Project. Moreover, Massport agreed that no further option payments would be due after the June 1, 2009 payment. Massport also agreed to revise the description of Tenant Improvements in the Development Agreement to reflect the design in Scheme B.1.2 rather than the original Scheme A.
Unable to find any other developer interested in becoming a joint venturer in the project or taking ownership of it, Vornado decided to initiate the Buy-Sell procedure. On March 13, 2008, it provided MAXX with its Buy-Sell offer in accordance with Section 4.1 of the Operating Agreements. Vornado determined that the Project Value was $2.5 million, before liabilities, and that MAXXs liabilities were $652,472.84, comprised of the unpaid rent on CDG’s office from February 15, 2008 through May 15, 2008, the option payments due to Massport from November 2007 through April 2008, and “Massport 3rd party reimbursements.”[5] After subtracting these liabilities from Project Value, having determined that MAXX’s Membership Interest was 27.00 percent (with Vornado’s Interest being 72.58 percent and Drew’s Interest only 0.42 percent), the Buy-Sell letter declared that the purchase price would be $1,340,839 for Vornado’s Interest and $498,886 for MAXXs Interest.
Vornado determined the Project Value through discussions among its Chief Executive Officer, President, Senior Vice President for Acquisition, and Executive Vice President for Retail Assets, with $2.5 million being the highest dollar figure proposed. They did not retain an independent appraiser to assist them in this determination because, as Vornado’s Executive Vice President for Retail Assets Sandeep Mathrani testified, “That is what we do for a living.” The gist of their reasoning was:
The joint venture’s only asset was the option granted by Massport to enter into the ground leases.
It was a condition of the Development Agreement that, if those ground leases were executed, CDG would commence and complete construction of the proposed mixed-use project (or a variation agreed to by Massport) on the leased property within a set time period.
As a result, the option had value only if a reasonable arms-length purchaser were willing to invest in the construction of the mixed-use project.
Under current market conditions, no reasonable arms-length purchaser would be willing to invest, so no mathematical value for the option could be ascertained.
The only potential value in the option lay in the possibility that, if market conditions were to change before construction needed to begin in July 2011, the project that presently was not economically feasible may become economically feasible.
The value of this future possibility could not be determined mathematically, but was a matter of experience and judgment.[6]
On March 27, 2008, MAXX responded to the Buy-Sell letter in writing, declaring that it was not a valid offer to purchase under the Operating Agreement because Vornado had failed to provide the information regarding the project necessary for MAXX to determine what action to take on the' Buy-Sell. MAXX also objected to the deduction of the liabilities in the proposed Buy-Sell, contending that it violated Judge van Gestel’s Order. On April 1, Mathrani, on behalf of Vornado, wrote MAXX that Vornado was willing to meet with MAXX at any time to discuss the project but would adhere to the 30-day deadline for the Buy-Sell decision — April 12, 2008. MAXX replied that it wanted the information it requested pro *461 vided in writing before it would meet with Vornado. On April 15, Vornado informed MAXX that, since the Buy-Sell Election Period had elapsed without MAXX making an election, MAXX under the Operating Agreement was deemed to have agreed to sell its Interests in accordance with the Buy-Sell Notice. Vornado declared that the closing would take place on April 30, 2008. MAXX replied that the Buy-Sell Notice was invalid and suggested that Vornado provide it with the information it had requested.
Vornado on April 25, 2008 provided short written answers to the “bullet point” questions in MAXXs letter, informing MAXX of the oral confirmation from Stop & Shop that its Board had approved the draft letter of intent and of the termination of negotiations with Target in January 2008. Vornado also attached the March 25, 2008 letter from Massport, extending the deadlines for closing. On April 29, 2008, MAXX deposed DeMarüno, Vornado’s Mass.RCiv.P. 30(b)(6) designee. The April 25 letter and April 29 deposition, however, did not cause MAXX to change its position regarding the validity of the Buy-Sell Notice; it failed to appear at the April 30 closing, so the closing never took place.
On May 15, 2008, Vornado sent two letters to MAXX. One informed MAXX that Massport had informed the Managers that it wanted all outstanding option payments paid by June 30, 2008, the close of Massport’s fiscal year. No option payments had been paid since November 1, 2007, and Vornado wanted MAXX to share in the cost of these payments. The other letter was a second Buy-Sell Letter, which again defined the Project Value as $2.5 million but did not deduct any liabilities from this amount. As a result, the purchase price for the MAXX Interests was set at $675,000, while the price for the Vornado Interests was $1,814,500. The closing date for the Buy-Sell was scheduled for June 16, 2008, shortly after the expiration of the 30-day election period.
On May 21, 2008, Lowell Richards, III, Massport’s Chief Development Officer, sent a letter to Drew (which was promptly forwarded to MAXX), clarifying that, despite the wording of its March 25, 2008 letter, the Massport Board had not conditioned its extension of the closing date on MAXXs sale of its interests to the Managers. Rather, he wrote, the Board Vote simply required that the Developer certify to the Board that “it had resolved its internal corporate issues with MAXX in accordance with the terms of the Buy-Sell Agreement by December 31, 2008.” Richards made clear that MAXX’s buy-out of Vornado would be acceptable to the Board, provided MAXX then engage a suitable Retail Expert, since Vornado qualified as a Retail Expert and neither MAXX nor Drew did.
On June 11, 2008, just three days before the end of the 30-day election period, MAXX wrote Vornado that the second Buy-Sell offer was also invalid. MAXX contended that Vornado continued to withhold information from it, including the latest tenant and i-Cubed financing information, and had committed CDG to Scheme B.1.2, which MAXX had rejected. Drew quickly obtained a letter from Massport, dated June 13,2008, that clarified that Scheme A was still acceptable to Massport; the Board vote had simply declared that the smaller Scheme B.1.2 would also be acceptable if other requirements were met.
MAXX failed to appear on June 16 at the closing on the second Buy-Sell Notice. Two days later, Vornado filed its counterclaim, seeking, among other relief, specific performance of the Buy-Sell provision, requiring MAXX to sell its Interests in CDG at the price set forth in that Notice.
DISCUSSION
It is plain that CDG has been effectively in deadlock since September 10, 2007, when MAXX rejected the Managers’ request for MAXXs approval of two Major Actions — to modify the Development Plan by replacing Scheme A with Scheme B.1.2 and to modify the Development Budgets in accordance with the change in development schemes. The Operating Agreement anticipated the possibility of such a deadlock and provided a specific procedure to resolve it — the Members would work together in good faith over the next fourteen days to resolve it and, if their efforts failed, MAXX and Vornado each had the opportunity to trigger the Buy-Sell. Operating Agreement at §4.1 (e)(iii). Here, all efforts to resolve the deadlock have failed and Vornado twice exercised its right to trigger the Buy-Sell. Since Vornado chose not to attempt to enforce its rights under its first Buy-Sell Notice, this Court will focus solely on the validity of the second Buy-Sell Notice, which was issued on May 15,2008 and scheduled to close on June 16, 2008.
MAXX essentially articulates three reasons why the Buy-Sell should not be enforced in accordance with the Operating Agreement. First, MAXX contends that Vornado was in default on May 15, 2008 and therefore, under Section 4.10(e) of the Operating Agreement, had lost its right to initiate a Buy-Sell. Second, MAXX contends that the Buy-Sell offer price was well below CDG’s Project Value and breached Vomado’s obligation of good faith and fair dealing. Third, MAXX argues that, by delaying so long after the deadlock had been apparent to trigger the Buy-Sell procedure, Vornado had lost its right to do so. This Court will address each argument in turn.
1. Did Vornado commit an Event of Default and thereby lose its right to initiate the Buy-Sell?
The Operating Agreement specifically identifies the events that may constitute an “Event of Default.” Id. at §4.9. Given the severe remedies provided in the Agreement for an Event of Default, including termination of the Development Agreement, removal as a Manager, and the loss of the Buy-Sell, see id. at §4.10, it is not surprising that the events that may trigger a default are both few and serious. Here, the only breach that MAXX has identified that arguably falls within the definition of an Event of Default is Vomado’s alleged “taking of any *462 Major Action . . . without first obtaining the prior consents required by the terms of this Agreement and such action is not reversed or otherwise cured within a Reasonable Period.’’ Id. at §4.9(b). A Reasonable Period is a defined term in the Agreement, meaning:
[W]ith respect to any defaulting Member or other Person, a period of 30 calendar days after such defaulting Person (or the Member of which it is an Affiliate) receives written notice of its default from a non-defaulting Member or other Person; provided, however, that if such breach can be cured but cannot reasonably be cured within such 30-day period the period shall continue up to a maximum of 90 additional calendar days so long as the defaulting Member is diligently taking all reasonable actions to mitigate such default and the surrounding circumstances and is diligently prosecuting the cure to completion.
Id. at p. 13. When one considers the definition of Reasonable Notice in the context of Section 4.9(b), it is plain under the Agreement that, if a Member alleges this Event of Default, the Member must provide written notice of the default and the alleged defaulting Member has at least 30 days to cure the alleged default.
Here, prior to the scheduled June 16, 2008 closing date on the second Buy-Sell offer, MAXX had issued only one Notice of Default, on August 14, 2007, the day after Judge van Gestel allowed MAXX’s motion for a preliminary injunction. That Notice was not offered in evidence, so this Court can discern its content only by inference from Judge van Gestel’s September 25, 2007 decision, which made reference to it. Giving MAXX the benefit of the doubt, this Court shall infer that three defaults were alleged: (1) the failure to provide information regarding the status of the project (including the failure to provide the financial statements required by the Operating Agreement), (2) the Managers’ incurring of expenses beyond the Approved Budget, and (3) the Managers’ pursuit of Scheme B.1.2, when the Development Plan called for Scheme A.[7]
As to the first alleged default, the failure to provide information is not among the breaches identified as an Event of Default. Therefore, even though Vomado had failed timely to issue the financial statements called for in the Operating Agreement and arguably failed to provide certain information that MAXX, in theory, could have used to evaluate whether to buy at the Buy-Sell offering price, this failure would not constitute an Event of Default and, therefore, would not prevent Vomado from proceeding with the Buy-Sell. Moreover, this Court further finds that, if Vomado did fail to provide MAXX with all the information it would have needed to evaluate the Project Value of CDG, that failure caused no harm to MAXX, because Fish made it plain in his trial testimony that MAXX was never going to buy CDG, regardless of the price. Indeed, Fish testified that he thought that CDG was worth more than the $29 million that MAXXs expert, Webster Collins, opined was the high end of his estimate of value, but still had no interest in purchasing CDG for the $1,814,500 set forth in the second Buy-Sell Notice. Consequently, apart from having no legal basis in the terms of the Agreement, MAXXs claim that it lacked the information it needed to evaluate the Buy-Sell offer is a charade, since it never had any intention of being the buyer in a Buy-Sell.
As to the second alleged default, even if Vornado had incurred CDG expenses in excess of the Approved Budget, Vornado had cured its default by September 28, 2007, when it transferred $2,259,011.20 from its own funds to pay CDG’s outstanding invoices, without including the payment in CDG’s books as either a loan or a capital contribution, and instead asking the Court to order MAXX to reimburse it for its just share of these expenses as part of the final adjudication of this case.[8] By paying all the expenses in question, CDG was not burdened by any expense that would have been paid through the funds sought in the sixth Capital Call. Consequently, by paying all these expenses itself, at least until the Court could allocate responsibility for them as part of its final adjudication, Vornado, if it had indeed committed an Event of Default by incurring these expenses without MAXX’s approval of the Major Action of a budget revision, cured that default long before it issued the second Buy-Sell Notice.[9]
As to the third alleged default, there is no evidence that Vomado had contractually committed CDG to proceed with Scheme B.1.2. The letters of intent with Stop & Shop and Target, which were premised on Scheme B.1.2, were not binding upon either CDG or the tenants. Massport had made clear in Richards’ June 13, 2008 letter that the Development Agreement had not been amended and that Scheme A was still the approved scheme; all that the Board had done was declare that Scheme B.1.2 would also be acceptable if other requirements were met. Therefore, while Vomado was plainly pursuing Scheme B. 1.2 on behalf of CDG, it had not done anything that contractually bound CDG to pursue that scheme if MAXX had chosen to buy CDG in the Buy-Sell.
This Court further finds that Vomado was not barred by the Operating Agreement from exploring other alternative schemes once it became clear that Scheme A was too expensive to build to be economically feasible. Once the cost estimates of Scheme A were obtained, it became clear to all, including MAXX, that Scheme A could not reasonably be pursued as designed and that a Major Action would be needed to move to a more economically feasible scheme. Under the Operating Agreement, the Managers were not required to give up once it emerged that a Major Action would be needed to redesign the project. As noted earlier, clause (u) of the definition of Major Action expressly provides, “Notwithstanding anything herein to the contrary, the preliminary exploration and review of the feasibility or the potential outcomes or consequences of adopting a Major Action shall not, in and of itself, constitute a Major Action requiring MAXX consent.” Id. at p. 10. In essence, with its September 28, *463 2007 agreement to pay all outstanding invoices, Vomado was exploring the feasibility and the consequences of the proposed Scheme B. 1.2, and was using its own money to do so. It committed no Event of Default in so doing.
Therefore, this Court finds that, at the time of the second Buy-Sell offer (and, indeed, as of now), Vomado had committed no uncured Event of Default under Section 4.9 of the Operating Agreement that, under Section 4.10(d), would cause it to lose its entitlement to initiate the Buy-Sell or to be a buyer under the Buy-Sell procedure.
2. Did Vornado breach its obligation of good faith and fair dealing in setting a Buy-Sell offer price below the CDG’s Project Value?
Under Section 6.3(c) of the Operating Agreement, “(t]he purchase price for the Membership Interests to be sold [under the Buy-Sell provisions] shall be equal to what the selling member would receive in respect of its Membership Interests in the Company if (i) the Company . . . were to sell all of [its] assets for cash equal to the Project Value, (ii) all actual liabilities of the Company... were paid . . . and (iii) the balance distributed to the Members . . .” This is consistent with the definition of “Project Value” in Section §4.1(e) (iv)(A) — "the total cash value of all the assets of the Company . . . before debt." All agree that the Project Value is meant to reflect the fair market value of CDG’s assets. In short, the Buy-Sell offer price should be the fair market value of all CDG’s assets, determined without regard to CDG’s liabilities, less the amount of those liabilities.
The Operating Agreement does not specify how Project Value is to be determined. Nor does it require that an independent appraiser be retained to determine Project Value. Nor does it establish a procedure to resolve differences among the Members regarding Project Value. Nor does it declare it an Event of Default to state a Project Value below or above market value. None of these omissions are surprising, since the virtue inherent in the Buy-Sell procedure is that it is self-policing — if a Member sets the Project Value in the offer below fair market value, then that Member will likely suffer the consequences of having to sell its Interests at a lower than fair market price. Just as the child who cuts the cake, knowing that his brother gets to choose the largest piece, has an incentive to cut the pieces evenly, so, too, does the Member initiating the Buy-Sell have an incentive to ensure that the Project Value reflects fair market value, lest it have to sell its Interests for too little or purchase the other Member’s Interests for too much.
Consequently, given the absence of any express contractual provision to the contrary, this Court will interfere with the Buy-Sell procedure only if the Member initiating the Buy-Sell violates the implied covenant of good faith and fair dealing in setting the Project Value. Realistically, this could happen only if the initiating Member knows that the other Member will refuse to buy regardless of the price, and acts in bad faith to set a price well below fair market value, so that it can buy the other Member’s Interests at the cut-rate price when the other Member fails to exercise its right to buy.
The issue to be decided here, then, is not whether the Project Value reflected the fair market price but whether Vornado acted in bad faith in declaring the Project Value to be $2.5 million. To be sure, in making this determination, this Court may consider whether the Project Value was a fair reflection of fair market price, but that finding is relevant only to the extent that it bears on the ultimate issue of whether Vomado acted in good faith in establishing the Project Value.
As to the subsidiary issue of fair market value, the parties each proffered their own expert, with their own methodology for determining the fair market value of CDG’s assets. Vornado offered the testimony of Steven Foster, a senior vice-president at Lincoln Properties, who has been conducting appraisals for 25 years, specializing in commercial income-producing properties. He opined that $2.5 million was a reasonable estimate of Project Value. He determined that the primary asset of CDG was its option for ground leases with Massport, and determined what the value of that option would be to a reasonable developer. He observed that there were various features of this project that would give pause to many developers:
the retail mall was to be built on a platform above the Silver Line;
the land would be owned by Massport rather than by the developer in fee simple;
Massport had limited the use of the site and imposed requirements regarding construction as part of the ground leases;
while CDG had lined up two anchor tenants, neither were high-end anchor tenants; and
the project was being built in an emerging area of Boston (which was intriguing because the area was emerging but risky because it had not yet emerged).
He also observed that the rates of return being demanded by commercial developers of comparable properties had increased as a result of the recent banking crisis. He opined that there were at least two reasons for this change, apart from a diminished appetite for risk. First, developers were now being required by lenders to invest a greater percentage of their own funds in such projects, so the developer was now risking more of its own money. Where, before, a developer would need to put up only perhaps 20 to 30 percent of the funds, now it would commonly need to contribute half. Second, the costs of construction were continually increasing, which was squeezing early profit estimates.
Foster found that the estimated internal rates of return (a measure of yield on investment) in CDG’s various pro formas were all below the return that a reasonable developer would demand in order to invest in the project. Indeed, they were below the minimum threshold internal rate of return even with estimates of condominium sales *464 prices that (to be polite) were “aggressive” in this real estate climate and with the assumption that $75 million in I-Cubed funding would be granted to the project, an equally “aggressive” assumption. As long as the estimated rate of return fell below the threshold that would interest a developer, Foster found that the option was worth little, even with the permits that had been obtained, because a developer is unlikely to pay much for an option it does not presently intend to exercise.
MAXX offered the testimony of Webster Collins, an executive vice president at CB Richard Ellis New England for 25 years, and an individual who has been active in the appraisal of commercial income-producing properties for 30 years. Collins opined that the Project Value could have ranged from a low of $20.15 million to a high of $29.15 million, depending upon the assumptions employed, and could not reasonably have been estimated at $2.5 million. Collins used a wholly different analysis than Foster, which focused on valuing the leasehold at issue through comparable sales. Since there were no comparable options sales or leases, he identified various comparable sales of land in fee simple in and around downtown Boston and the Seaport in order to determine the appropriate Floor Area Ratio (the price per buildable square foot), and, using that ratio, multiplied it by the buildable square feet in the Core Block, he then sought to value Massport’s remainder interest in the property, which he deemed small given the 95-year length of the ground leases. He then subtracted the amount due in ground rent and discounted the anticipated returns from the condominium sales, which he understood would not take place for five years, to determine the value of the leasehold. In effect, he determined what the land in the Core Block would sell for in fee simple, and discounted that valuation to come up with the value of the leasehold. To rebut Foster’s findings, he also calculated the project’s return on cost, using Vornado’s net income and cost estimates from its September 19, 2007 Status Report, and found that, using the capitalization of income approach, the fair market value of the project would exceed its cost by more than $54 million, yielding a 24 percent return on cost.
This Court finds Foster’s analysis to be more persuasive than Collins’s for five reasons. First, Collins’s analysis fails to take into account that the Massport ground lease was far more restrictive than a typical ground lease in that it set firm deadlines for the developer to complete construction, which effectively meant that a developer who signed the ground lease needed to commence construction immediately. The developer did not have the option of using the land as a parking lot while it waited for the real estate market to improve. A 95-year ground lease without any such deadlines for investment would be more valuable to a developer than one which committed him to invest hundreds of millions dollars within a short time frame, especially now when the real estate market is in such turmoil. Collins assumed that Massport would be infinitely patient and agree to any postponement proposed by the developer, but no reasonable developer could assume such flexibility from Massport. Second, the comparable fee simple sales relied upon by Collins were all concluded before the credit crunch commenced in 2007. Collins admitted that now, developers need to put up more of their own equity, which diminishes the number of developers who are able to consummate such deals. Third, Collins’s return on cost estimate assumed that the developer would obtain $75 million in I-Cubed funding; if only $20 million in funding were received, the 24 percent return on cost turns into a slight loss. There was little evidence regarding the likelihood of obtaining this amount of I-Cubed funding but, at a minimum, there is a substantial risk that the actual amount of I-Cubed funding would fall well short of $75 million since only $200 million has been appropriated for I-Cubed funding statewide. Fourth, Foster’s analysis has been borne out in the real world; Vomado tried to shop MAXX’s Interest in the project and could find no developer interested in making the investment. If any of the four developers solicited by Vomado had seen the project to be as profitable as Collins, someone would have jumped at the opportunity to enter the joint venture. Fifth, although MAXX had no desire to buy Vomado’s Interests, if it truly believed it could purchase an asset worth more than $20 million for only $1,814,500, one would think it would have more seriously explored the possibility of being the buyer in the Buy-Sell, if only quickly to sell all or part of CDG at a profit to a developer more interested in playing an active role in the project.
Therefore, this Court finds that $2.5 million was a reasonable estimate of CDG’s Project Value at the time of the second Buy-Sell and that Vornado acted in good faith in making that determination.
3. Did Vornado lose its right to initiate the Buy-Sell by waiting so long to-do so?
MAXX contends that, once MAXX on October 10, 2007 had rejected the Major Action of revising the Development Plan and the Development Budget to move from Scheme A to Scheme B. 1.2, Vornado should have immediately initiated the Buy-Sell rather than wait until March 2008 to do so. MAXX argues that, because of that delay, applying the doctrine of laches and unclean hands, this Court should refuse to grant specific performance of the second Buy-Sell to Vomado.
Under Section 4.1 (e)(iii) of the Operating Agreement, upon the disapproval of a Major Action and the failure over the next fourteen days to resolve the disagreement, MAXX and Vornado each had the right to initiate the Buy-Sell. Therefore, if MAXX had thought that a Buy-Sell needed to be initiated in the fall of 2007, it could have done so itself. Section 4.1, while it carefully sets numerous deadlines regarding Major Actions and the Buy-Sell, did not establish any deadline by which a Member was required to initiate the Buy-Sell or lose the right to do so. Since the Operating Agreement set no such limit and *465 since MAXX had the power to initiate the Buy-Sell itself, it would not be equitable to impose upon Vomado a time limit to initiate the Buy-Sell.
For all these reasons, this Court finds that Vomado properly initiated the second Buy-Sell and is entitled to specific performance of the Operating Agreement’s terms regarding that Buy-Sell. Consequently, MAXX is ordered to appear at a closing at a date designated by Vornado to sell its Interests in CDG to Vornado at the price designated by this Court in its Judgment. Moreover, by having earlier refused to sell its Membership Interest through the second Buy-Sell, MAXX has committed an Event of Default under Section 6.3(f) of the Operating Agreement. Under this provision, if a Member needs to initiate an action for specific performance to force the sale, as Vornado needed to here, “the purchase price shall be subject to reduction for any costs of enforcement incurred by the Purchasing Member (including attorneys fees and expenses).” Consequently, Vornado is entitled to an offset of its purchase price for the reasonable attorneys fees and expenses it incurred in prosecuting its counterclaim in this action. Vornado shall serve its application for those attorneys fees and expenses no later than August 8, 2008, and MAXX shall serve any opposition to its application no later than August 15, 2008, with both being filed by August 18, 2008. A hearing shall be held on August 20, 2008 at 2 p.m. to determine the reasonable amount of attorneys fees and expenses to be offset.
Responsibility for the Massport Option Payments from June 1, 2007 through July 31, 2008
The final issue this Court must resolve is the allocation, if any, of the Massport option payments that CDG was required to pay from June 1, 2007 through July 31, 2008.
As this Court has earlier found, the need to fund these option payments, along with other unpaid expenses, caused the Managers to issue the sixth Capital Call on June 19, 2007, which triggered MAXX to initiate the instant action, seeking a judicial declaration that MAXX had no obligation to make any further capital payments to CDG. On August 13, 2007, Judge van Gestel preliminarily agreed with MAXX, finding, based on the record before him, that the sixth Capital Call was not authorized under the Operating Agreement. Memorandum and Order on Motion for Preliminary Injunction, at 8 [23 Mass. L. Rptr. 29]. Vomado later agreed to pay the Massport option payments through October 31, 2007, as well as roughly $1.9 million in other expenses, with the proviso that it would ask the Court later to adjudicate whether MAXX was obliged to share in these payments. Judge van Gestel had indicated in his September 25, 2007 decision that Vomado could probably protect its rights in this regard through a counterclaim, which it later made. At the end of trial, Vomado, through its counsel, desiring closure and recognizing the limitations of the evidence presented at trial, limited its counterclaim to MAXXs share of the Massport payments, both the amounts paid by Vomado for the period from June through October 2007 and the amount remaining to be paid by CDG.
There is certainly a dispute as to whether all or some of the expenses incurred by the Managers after MAXX’s rejection of the Major Action on October 10, 2007 were inappropriately expended in furtherance of the rejected Major Action or were appropriately expended to explore and review the feasibility or potential consequences of adopting a Major Action. This Court, with Vornado’s claim having been narrowed, need only resolve this dispute with respect to the Massport option payments. As to that precise issue, this Court finds that the Managers were entitled under the Operating Agreement to continue to make these payments even after the Major Action of a revised Approved Budget had been rejected, because the obligation to make those payments was part of the Development Agreement that CDG had entered into with Massport and was fundamental to the preservation of CDG’s primary asset — the option to purchase the ground leases.[10] Indeed, with that option, CDG retained value; without it, CDG was a worthless shell. Therefore, regardless of whether the Managers were entitled to issue a Capital Call to fund any other expenses, they were certainly entitled to issue a Capital Call to fund the Massport payments.
Having so found, it becomes rather complicated to fashion a remedy here. Judge van Gestel had essentially prevented any further Capital Calls through his preliminary injunctions and both Vomado and MAXX had adapted its behavior to his order. Had he not granted the preliminary injunction, MAXXs failure to fund the sixth Capital Call would have been an Event of Default under the Operating Agreement that would have entitled Vomado to fund MAXXs unpaid share with a loan at 15 percent interest or by an additional capital contribution, which would have increased Vomado’s Capital Contributions and reduced MAXXs by twice the amount paid, thereby doubly diluting MAXXs Interests. Operating Agreement at §3.4(a). If MAXX had then decided to fund the sixth Capital Call, its percentage ownership of CDG would have increased; if it had decided not to fund it, its ownership share would have decreased by a larger percentage. Since that choice did not need to be made as a result of Judge van Gestel’s decision, this Court would simply be speculating as to what MAXX ultimately would have done.
Considering all these circumstances, this Court finds that the most sensible solution is also the simplest. Under the Buy-Sell, Vomado will be purchasing MAXXs Interest in CDG at the $2.5 million Project Value, less any liabilities, multiplied by MAXXs ownership share — 0.27—less Vomado’s attorneys fees and expenses incurred in prosecuting its counterclaim. Under the March 13, 2008 Buy-Sell, Vomado did not include any liabilities, expecting that the Court would later allocate those liabilities. In view of this Court’s finding that MAXX should contribute its fair share of the Massport payments, this Court will declare that the Massport payments advanced by *466 Vomado for the period from June through October 2007 ($343,750) shall be deemed an interest-free loan from Vomado to CDG and shall be treated as a liability of CDG, as will the unpaid amounts due to Massport for the period from November 1, 2007 through July 31, 2008 (including any interest imposed by Massport for late payment). Those liabilities shall then be deducted from the $2.5 million Project Value, and the difference multiplied by 0.27 to determine Vomado’s purchase price for MAXXs Interests in CDG, which will then be reduced by the amount of reasonable attorneys fees and expenses incurred in Vornado’s prosecution of its counterclaim, which shall be determined by the Court.[11]
ORDER
For the reasons detailed above, this Court FINDS that Vornado properly initiated the second Buy-Sell and is entitled to specific performance of the Operating Agreement’s terms regarding that Buy-Sell. Consequently, this Court ORDERS that:
1. MAXX shall appear at a closing at a date designated by Vomado following the issuance of the Judgment to sell its Interests in CDG to Vornado at the price designated by this Court in its Judgment. That price shall be calculated as:
The Project Value of $2,500,000 less
CDG liabilities ($343,750 plus the unpaid amounts due to Massport for the period from November 1, 2007 through July 31, 2008, including any interest imposed by Massport for late payment])
multiplied by 0.27
less
the amount of reasonable attorneys fees and expenses incurred in Vomado’s prosecution of its counterclaim, which shall be determined by the Court.
2. The parties shall confer as to the amount due for Massport payments in formulating a proposed judgment. Vornado shall serve a proposed judgment no later than August 8, 2008. If MAXX objects to the Massport calculation, it may oppose the issuance of the proposed judgment and offer its own by August 15, 2008, with both filed by August 18, 2008.
3. Under Section 6.3(f) of the Operating Agreement, Vomado is entitled to an offset of its purchase price for the reasonable attorneys fees and expenses it incurred in prosecuting its counterclaim in this action. Vomado shall serve its application for those attorneys fees and expenses no later than August 8, 2008, and MAXX shall serve any opposition to its application no later than August 15, 2008, with both being filed by August 18, 2008.
4. A hearing shall be held on August 20,2008 at 2 p.m. to determine the reasonable amount of attorneys fees and expenses to be offset, and the amount of the judgment.

Drew had created a new entity for purposes of this joint venture — Drew/Core Development LLC, which was formally the member.

The net cost was the total development cost, plus residential sales commissions and ground rent, less the amount it expected to earn from the sale of the condominiums and residential parking spaces, assuming that the condominiums would be sold at a price of $660 per net square foot and the parking spaces at $50,000 per space.

Under the Operating Agreement, “[t]he adoption of any Operating Budget” is a Major Action. Operating Agreement at p. 9.

After trial, Vomado provided MAXX and the Court with Exhibit A, which reflects the terms that Stop & Shop approved, described by Stop & Shop as the “deal economics.” This Court has deemed Exhibit A to be an exhibit at trial, since it should have been earlier produced and, if it had, would have been offered by MAXX and admitted into evidence.

No evidence was offered at trial regarding these third-party reimbursements.

In his testimony, Mathrani referred to the $2.5 million fair market value estimate as its “intrinsic value,” which he said reflected the project’s “goodwill.” When questioned by the Court, he revealed that what he meant by the intrinsic value of its goodwill was simply the value of the option through 2011 in the event the market changed favorably. This Court does not see this value as either “intrinsic” or as “goodwill,” but it does understand how an option that grants a developer “first dibs” on a project for many years may have value even if no developer would wish to develop that project now.

Each of these alleged defaults were included in the Notice of Default issued by MAXX on July 15, 2008, which was on the eve of trial and more than one month after the scheduled closing on the second Buy-Sell.

This Court expressly makes no finding here as to whether these expenses were improperly incurred, but will address this issue later. For now, it is sufficient for this Court to find that, if there had been a default in this regard, it was timely cured.

Although not dispositive because only a preliminary finding, this Court observes that Judge van Gestel made clear in his third decision that he would not enjoin the Buy-Sell if this cure were accomplished.

Although the Approved Budget was not entered in evidence, this Court infers that the Massport option payments were part of the Approved Budget, since they were mandated by the Development Agreement. Under Section 4.1(d), a Major Action could be taken without receiving the prior written approval of MAXX if the Major Action were “provided for in the Development Plan or an Approved Budget.” Therefore, even if the option payments had become a Major Action under clause (g) of the definition of Major Action because their payment would cause CDG, when combined with other expenses, to pay an amount in excess of 105 percent of the amount allotted in the Approved Budget, their payment did not require MAXX’s prior written approval because these expenditures were provided for in the Approved Budget and implicit in the Development Plan.

It is not clear to this Court that the Massport payments due after November 1, 2007 can be precisely ascertained from the evidence offered at trial, but it is clear that the parties should be able to agree as to the precise total without much difficulty. This Court understands the amount due after November 1, 2007 to be $650,000, plus interest, but is not certain whether interest was actually charged and, if so, how much. Therefore, the parties shall confer as to this amount in formulating a proposed judgment, and Vornado shall provide its proposal no later than August 8, 2008. If MAXX objects to the Massport calculation, it may oppose the issuance of the proposed judgment, and the Court will resolve any differences.